We are now prepared to hear arguments in the case of Doriety v. Sletten. Good morning. I beg your pleas in court. My name is Attorney Harry Daniels. I have the privilege to represent the appellant, Wakita Doriety, the Administrator for the Estate of Santal Crenshaw. We appeal this matter from the District Court because we believe the District Court erroneously determined that Officer Sletten used deadly force was not unreasonable as a matter of law. In reaching that conclusion, the District Court erroneously determined that it was undisputed that Officer Sletten was in the forward trajectory of the car driven by the Santal at the time he used deadly force. In fact, one of the issues here is that the body-worn camera of Officer Sletten within itself creates a dispute as to whether Officer Sletten was in the trajectory path of the vehicle at the time that he used deadly force. This matter turned on a motion to dismiss 12b-6. In 12b-6, what evidence does the District Court consider, or what does the District Court consider, determining 12b-6? Your Honor, the District Court should consider the plaintiff's amended complaint. Within the four quarters of the complaint, as well as the plaintiff's made a plausible claim as to a state claim which relief can be granted. In this case, the District Court... Does the District Court consider evidence, witnesses, videos, along with that? That's correct, Your Honor. That's correct, what? In this case, the District Court did. But the District Court, in this case... I'm not concerned what it did. I am concerned, but I want to know, should the District Court consider evidence outside of the pleadings? Your Honor, my response to that is no. The District Court should consider evidence within the pleadings alone as to whether, under Iqbal and Tuombo's standard, as to whether a plausibility is opposition that is plausible, which is a less standard as a Rule 56 summary judgment as to whether it's disputed facts. But is it plausible... I could consider a video if you and your complaint attached it or made a reference directly to it because it would become part of your complaint. Is that correct? That's correct, Your Honor. No, Your Honor, we did not make a reference to the video in our complaint. We did not get a chance to get to that particular point. And what statements that was in the complaint, allegations, we pulled those statements from a witness. Why did you go on to address this video? I mean, once the video comes up, why did you just kind of go along with it? Well, Your Honor, when the video came, the defendants filed a motion to dismiss and attach the video in their motion to dismiss. As opposition, this time this bill has been wronged, and we responded to that in our response to show it was a disputed fact as to the trajectory of the vehicle. You're on 12B-6. I mean, you could have easily said, Your Honor, we are here on 12B-6 and we're simply addressing, as you say, on April 11th, our complaint here. And this complaint here, viewed in the light of you taking this through, supports sufficiency to be able to establish it as a claim. It should not be dismissed. That's correct, Your Honor. And that's an argument where you're dealing with videos being submitted, as Your Honor stated, particularly when videos should not be considered. What you do is you get in the video and you have the district court looking at the video to see what's going on and everybody arguing about what's going on. And it gets up here and we review the video going back and forth, and then finally someone stops and says, this is 12B-6. Why are we doing this? We don't look at evidence. This is not a summary judgment. We haven't gone through discovery. And that's what kind of muddles this, but in the process of it, you seem to have gone along with it. So the question is, what does that do? Does it convert this over to a summary judgment? Does it change it to something else? Your Honor, it does not convert it over to a summary judgment because one of the things, even if the video had been submitted, you're talking about is whether the judge, in fact, could allow the video outside of the amended complaint. And obviously on the Scott v. Harris, the amended complaint or the allegation of the complaint had to be blatantly contradicted. The video has to be blatantly contradicted. Your Honor, it was the totality of the incident, I believe maybe 104 videos in the totality. However, one video was the court looked at one video, and that video was not the video that was reported to be submitted to the court, which should have been a body camera of Officer Slatton, which is a six-minute or so video. In fact, the court looked at a community and critical incident brief video that was manufactured and edited by the city of Greensboro, which in that video had very biased and slanted positions as to whether the shooting itself was justified. The court tried to cure that in her order in a footnote. How do you know that video has been edited and changed? Is that part of the record? Your Honor, the video has been changed because the video, in fact, that should have been submitted was just a body camera. The video had commentary in it from a narrator, and the video itself specifically dealing with the shooting was a side-by-side dash camera. Let me ask you, did you object to that below for the district court? I was curious about that. We did not know that the defendants reported to submit the video of the body camera. We did not learn that the courts did not have the body camera. We learned at her order that the courts, in fact, looked at a different video, was community briefing video. So the defendants and the plaintiffs had no knowledge about this particular video at the time when the court was considered. We was under the belief that the courts were considering the body camera. But the courts was looking at, although the courts tried to cure that, was actually looking at a briefing for the city of Greensboro, which was heavily slanted for the city. Mr. Daniels, the court found that, do you think the court was stating the facts in the light most favorable to the plaintiff when it said it's undisputed that the car was headed straight toward Officer Slutton? Absolutely not. We don't believe the courts were stating that. Could you explain that to us? The thing that, let me tell you what concerns me about this case is we've got three shots. We're not talking about a single shot. And not all of the shots, just one shot through the front windshield, is that correct? Or were there two? Yeah, it was disputed as to whether it was two shots. One went through the passenger side, right? That's correct. And when you say the passenger side shot, the one we believe that actually entered into the Santa's neck. Is there any, there's no evidence in this case as to which shot was fatal, is there? Not that it is time to present it on the record. We do believe, based on our preliminary findings, that the shot entered into the passenger side window. But the court didn't have that kind of evidence in front of it when it made its decision, right? That's correct, Your Honor. Okay. So, aside from the fact that you discussed the video and what the video showed, and I guess this is a friendly question on my part, but I just want to make sure that I understand that you are saying that the court was not, throughout, the court was not construing the facts in the light most favorable to the plaintiff. Absolutely. Would you tell us why? I think that would help. Thank you, Judge. We believe the court was construing its facts most favorable to the defendants in this case. Particularly, the court imported fictitious facts. One of the fictitious facts, or statements, in her order was that at the time, just prior before the shooting took place, is that a vehicle struck or collided with Officer Slatton, near Officer Slatton. Then he immediately started firing. When you look at the video itself, the video shows that Officer Slatton drives in. He, at a 90-degree angle, the Santor backs his car, inadvertently swipes his car in the parking lot, then pulls out. The district court imported a fact that simply is not true, that the Santor vehicle collided near Officer Slatton. It emphasizes the word near. Then he immediately started shooting. We believe the district court postured that in their position to fit in the Waterman analysis, specifically dealing with the most important thing that this court found in Waterman, as the reason with us at the time that Waterman passed police officers and they were shooting as he passed, that it was that they had knowledge that Waterman, in fact, had tried to run an officer off the road. This case is simply not Waterman. You're not talking about somebody on a police chase for 10 minutes. You're not talking about multiple officers approaching a car with a gun. You're not talking about trying to run a police officer off the road or driving at them 15 miles per hour and start shooting. You're talking about a slow three to five miles per hour pulling out. And at that time, as a car, we believe that it's a disputed fact that Officer Slatton started shooting into the vehicle when the vehicle was not in his trajectory path. So we believe that, based on the totality of the circumstances, and when you're dealing with the 12B6 standard, the plausibility, not as whether the fact is disputed. That's when you get into evidence. And Waterman was at summary judgment. That's correct. The majority of these cases that are cited in these briefs were at summary judgment stage. Waterman, Strickland, Goldman, that's an unpublished case, all of these were cases at summary judgment. This was not at issues of motion to dismiss at 12B6. In fact, when you talk about Williams v. Strickland case, and they're talking about split-second decisions, and it goes to the totality and the reasonableness of the officer, or objective reasonableness, you have to look at the facts of the case, specifically, before you can get to that particular standard. That's the difficulty we're having, at least at this stage of the proceeding. We surely do not want to hold officers to any higher level of standard for split-second decisions if you've got a vehicle coming toward them. The problem here, and you've submitted the videos, is I'm not sure how you could determine when those shots were fired. Did the district court do so based upon the audio? Your Honor, the district court looked at this video, this briefing, and said it was undisputed the shots were fired at the time that the vehicle was, Officer Slate was in a forward direction, a trajectory direction of the vehicle. That's an argument that it was not. This vehicle was moving very slow. Officer Slate didn't get inside his car, come around. In fact, this brief moment in which the headlights were shining, Officer Slate didn't shoot his gun. Not until the vehicle started turning away from him, he stopped and started firing. So to the extent what the district court deduced as to why she believes it's undisputed. Is that what you view to be if you take the allegation that the complaint is true, that he was turning away from you at the time? Because that's, I mean, if you're viewing the evidence, and that's where we're getting muddled. We're here, whether you agree to it or not, whether you invite it or whatever, may be a consideration. I don't know of a case that goes there with 12B6. I'm, you know, I think we need to keep these things clean, and I'm trying to determine what is it that your complaint has alleged here, and when we take that those allegations as true, are they plausible? I mean, Iqbal and Twombly, too, assert a claim upon which relief can be granted. And that's why we're getting back and forth, and we're going to deal with the other side, too, because perhaps there is an explanation. Judge Eagles is a very thoughtful judge here, and is very interested in the way this case has developed. So we just need to get a better understanding of what's going on here. But at this stage in the process at the 12B6, the issue is whether your complaint has set forth allegations that are sufficient or which taken as true. This is a light most favorable. It's true. It's sufficient to establish a claim. That's correct, Your Honor, and that allegation I made a complaint absolutely states a claim. When a 12B6 motion is granted, you talk about on the face of the complaint itself as to whether a claim can be stated. There's no statute of limitations to issues. There's no particular issue as a matter of law. Now, if there is something that absolutely refutes something you have in that complaint, couldn't the court consider that? Yes, Your Honor, and that's the Scott versus Herod. It has to be blatant and contradict. Blatant and contradict what we have in the complaint. Are we on with the video in terms of Judge Eagles considering it? If she makes a term, it absolutely refutes, but it has to conclusively do so, would it not? Absolutely. It has to blatantly contradict what's absolute contradicts what's in the complaint, and it does not, and you're talking about the plausibility standard here. We're not talking about a gene issue, material faculty on a rule on a summary judgment as to whether, is this complaint plausible as stated? And Your Honor, it's our position that it was that you can, that a objective reasonable officer could have done something different. And when you talk about should and could, and these particular matters, not to jump the state's jury question, because we're not there at this point. The question is, did this complaint meet the standard? And we believe this complaint shattered the standard on Rule 8 and met the plausibility standard. And to the extent that the judge looked at the video and discredited the complaint, the only thing that was discredited by the district courts in her position was that it's undisputed. That's not contradict. Contradict and undisputed are two different things. Your argument has gone to the liability of the officer here. But as far as the city is concerned, it's pretty clear you've not put enough allegation to say the city's waived its governmental immunity. Your Honor, normally I wouldn't, a lot of cases I'd argue, but at the end of the day, at this point, as it relates to our complaint, I don't think we have enough at this particular time. There may be later on. You didn't cite one case or anything to indicate it. The city said it didn't have insurance on it. So there's nothing here to indicate the city has anything other than governmental immunity. I would agree based on the evidence they submitted at this time, it does not appear that they have waived. But nevertheless, to the extent discovery, which we did not get a chance to do, that's something that we may be able to revisit at this time. But as it relates to the city response, I would agree. All right, Mr. Daniels, you've got a few minutes of rebuttal so you can come back. Mr. Lane, you may proceed with the argument. Thank you, Your Honor. Patrick Cain, representing Appalese Officer Matthew Slutton and the city of Greensboro. I want to start by saying opposing counsels stated this case is not Waterman. And I will come back to this, but I think this case is exactly Waterman and the trial court appropriately found that. Was there high speed involved in this case? Excuse me, Your Honor? Was there excessive speed involved in this case? No, there was not. Okay, then it's not Waterman on all fours. It may be like Waterman for other reasons you care to express, but it's not exactly Waterman, is it? I agree that the facts are not 100% consistent with Waterman. What about 12B6 and complaints and videos and audio shots and things of that nature that are considered here as fact-finding? And that's exactly where I was going, Judge Wynn. As I believe the court knows, 12B6 motions are typically viewed within the four corners of the complaint, but there are some obvious and well-respected exceptions to that, such as when evidence outside of the complaint is integral to the complaint, whether evidence outside of the complaint is subject to judicial notice, and whether the plaintiffs have relied on the evidence that's outside of the complaint. Which exception? Are you saying it's integral to the complaint? All three and perhaps four. Critical report that's been edited, I guess? Critical incident video? It is a public record that has been produced at the request of the North Carolina has a body-worn camera statute that requires for any body-worn camera video. Take it as an edited version. Was it edited? There was. Critical incident report edited. Video edited. There was editing in the critical incident report. What the parties relied on and what the court relied on had nothing to do with the edited portions. What the parties relied on in their briefing was video one of 104 that was publicly available on the city's YouTube site that showed the precise moments. It's a six-minute video that showed the precise moments. I'm saying taken together this exception fits because this evidence that's being here is absolutely refused what's in the complaint. I think it supplements what's in the complaint and it provides a better. Does it blatantly contradict in the Scott standard? I think it blatantly contradicts in some fashion but I don't think it blatantly contradicts in a way that is material here because as we go back to Waterman, Judge Keenan, in Waterman the court was very specific. Waterman has to be divided really into two separate cases. There were two very distinct factual circumstances and legal holdings that came from Waterman. In Waterman, Waterman was at the summary judgment stage and it appears that the original question about the factual analysis here in the case but in Waterman, that was at summary judgment. You would agree, right? We're at a different stage than 12B6. We're at a different stage but when you look at the evidence that is appropriately before the court through the video that we contend was properly before the court and that plaintiff has . . . The evidence that's properly before the court, that's appropriate. That's the issue. Was it properly before the court? You got to tell us why district court on 12B6 ventured into that. It has to be what Judge Keenan has alluded to that it gives you undeniable proof or irrefutable proof that the complaint is wrong. In other words, if you got something over here that shows that is just blatantly false, then you come with it. The business of, well, it's some evidence to show supplements. I don't know how you supplement. I guess the other side can supplement a complaint on the other side here. That's difficult to do because that complaint evidence could have arisen from there's another passenger in the car. There are other people around. It doesn't have to come from the video, does it? I don't believe that the evidence has to come from the video. I think that once . . . That's the point. That you don't get to supplement with somewhere it could have come from and say, because this is here, but go back. I'm not saying you can't get it, but it has to meet that standard that Judge Keenan alluded to. There were three witnesses in this case to this incident, weren't there? I don't believe there were three. Well, I suppose there's Officer Slatton, there was the deceased individual, and then there was a minor who was a passenger in the vehicle at the time of the shooting, yes. Okay, so there was at least one other person who could have shed light on what happened. See, what's bothering me about this case, Mr. Keenan, many things bother me, but one thing is the fact there were three shots fired in this case, and we don't know the relative position of the vehicle, do we? Vis-à-vis the officer, where the officer was standing as to each shot. And we know the vehicle was moving because the vehicle or the officer was moving, somebody was moving or something was moving because the shots were in different locations going through and into the vehicle. And we don't even know which shot killed Mr. Nisanto. Correct, Judge. So how can you throw the whole case out when there's so many unknowns? How do you have a blatant contradiction, as in Scott versus Harris, when there's so many unknowns here? This seems to me to be a case that should go to the summary judgment stage at least. The parties get discovery. We find out what the witnesses saw. The officer can be deposed as to what he was doing. We can have testimony before us as to, well, was each of the shots fatal? Was only one of them fatal? There's just so much that's unknown about the decision the officer had to make with regard to whether he changed his position vis-à-vis the vehicle or whether the vehicle itself was moving, which is probably more likely. The vehicle was trying to turn, and so his latest shot went through the passenger window. So it just seems to me there's almost an ocean of unknown facts here. And why would we then say, and I agree, Judge Agos is an excellent judge, but in the view of all of these unknowns, why would we just say the video refutes any potential evidence that could be developed in support of the plaintiff's complaint? And, Your Honor, I would bring you back to what I said at the very beginning was that this case is, and I appreciate that it's not 100% on all fours, but this case is Waterman Part 1. In Waterman Part 1, the court, in large reliance on the video, determined that the officers who fired the shots there fired them at a fleeing suspect who was driving a stolen car who, at the moment that the officers had to make the decision as to whether to fire or not, may or may not have been driving at them with the intention to injure them. The court acknowledged in Waterman Part 1 that none of the officers were actually directly in the line of the vehicle. Right, but the speed of the vehicle is really critical, isn't it, to the court's decision in Waterman? Because if you have a slowly moving vehicle starting to execute a turn, as might have been the case here, then that's not Waterman at all. The officers had reason to fear for their safety, and the court rightly said the officers did, at least until that threat had passed. But we don't know the speed of that vehicle here, do we? The amended complaint alleges that it was five miles an hour. Right, and if we take that fact in the light most favorable to the plaintiff, the video doesn't blatantly contradict that the car was moving at five miles an hour, and a five-mile-an-hour car in motion, the officer can certainly avoid, even if the vehicle's moving in his direction. The vehicle was moving, as the video shows, in close proximity, and the amended complaint says that the video, or that the decedent's car was mere inches from Officer Slatton's car. The car, and this is where it is important in determining what Waterman actually held, the vehicle lurched towards the officer in both cases. It was a stolen vehicle. The driver had been previously fleeing from capture. The car lurched forward in both cases in spite of a show of force by the officer, where Officer Slatton here had his gun drawn and was yelling commands to get out, get on the ground. That's alleged in the amended complaint. That's shown by the video, and it is that precise moment in time that matters for the determination of was it objectively reasonable, and that is a matter of- But what about the shot that went through the passenger's window? Is that objectively reasonable beyond any dispute? And we don't know if that was the fatal shot at this stage of the proceedings. Correct, Your Honor, but what we do know is that based on Waterman, Officer Slatton and a reasonable officer in his position would have been on notice that at the moment that car lurched towards him, he was constitutionally within his rights, whether he was ultimately wrong or not. That's what Waterman said, and that's what you have here. You have that. Waterman went on to say that once that car continued, and they continued to shoot, then that's not reasonable. Absolutely. That's the problem you have here. We can't tell when the three shots were fired. Maybe the first happened when he was coming toward him. Maybe the second there. Maybe the third. Locations are different. You look at that video, and you can't tell. How do you tell? Do you tell based upon the audio? The court can tell based upon the amount of time that elapsed between- Look at the video, which we've looked at, not just the amount of time, the sound of the shots. Is that what the court was relying on? What Judge Eagles relied on in order to determine the half second in time that it took for those three shots to be fired? Between what? Between the first shot and the third shot. You determine that based upon the audio. Is that correct? I believe it's a combination of the audio and the video. You're not looking at muscle fire, muscle fire, anything like that. It's the audio. Is that right? The audio and the video together. Which videos did you introduce? The one video that showed the actual incident, which was from- Did you also look at the dash cam? Excuse me? The dash cam, did you look at that? I believe she had access to the dash cam, but that dash cam didn't capture the actual shooting. Was there any sound on that? Was there any sound on the dash cam? I honestly don't know if there was sound on the dash cam or not. It was edited, but you say it wasn't edited in a way that would deal with the materiality that was here? That's correct. How do we know that? Because it was the video. The reason that the court asked for- How do we know that? How do we know that, looking at what we are dealing with here? How do we know? Frankly, yeah, you can look at half seconds, but you've got to hear the audio of this. And it's not very clear, even in looking at it on the pellet level, that these shots are happening at specific times and specific things are happening. And you've got three shots. And you may want us to believe there's one shot, but the cases basically said, you know, even Waterman strictly, they deal with separate shots, multiple shots, even in split seconds can be treated differently when you have a moving target such as what you're dealing with here. That's the problem here. That's the differentiation with Waterman. Yes, the first part of it, as you say, part one, if you're coming toward me, you can use it. But it wasn't just one shot. It was three shots. And the question is, where was he during the three shots? Correct, Your Honor. And the clearest- Which takes it out of Waterman. It puts it in because that's what Waterman did. Waterman said, yeah, you acted reasonably when that car was coming toward you, even to the side. It could have swerved and hit you. But when it continued to move and you continued to shoot, that's not considered to be a reasonable use of delicacy. That's absolutely correct, Your Honor. Why is that not what we are dealing with here? You've got a car moving, three shots. We can't tell. Maybe we, maybe Judge Eagle could. I don't know. When the three shots occurred. I believe it's very clear from the video when the three shots occurred and that they all occurred in a total of less than half a second. You're saying when the three shots occurred, it's, you know, if you're looking at the gun, you see the fire coming from it. That's different. You don't see it here. It has to be the audio. And do we know that audio is in sync with the video? There's a lot of evidentiary stuff here in the middle of this that one can just leap to and say, oh, yes, anybody can see this. I mean, it just sounds like it sounds good. But in a court, we don't do that. We need something more specific when we're dealing with the shooting and the killing of someone under circumstances like this, for which it's available. I mean, we can determine this. There may be evidence further that can come out to tell us how to do it. And, Your Honor, I agree. Summary judgment. I agree with what Your Honor is saying with respect to what Waterman said with respect to subsequent shots where initial shots may have been constitutional. And, in fact, as a matter of law, the initial shots in Waterman were deemed to be constitutional. That's right. And then it was later shots that were seconds later. That's the issue we got in this case. And the question is, even if we, and I'm not saying that the first one was even constitutional, I'm just saying if we just take it to be that way, that when the person was coming, there's a car. It looks like it's coming toward him. But then it moves. And the question is when those shots are being fired. And we can't tell. I don't know how you tell it, to be honest. I believe the video shows that. Well, shows is a word you use. But listens is a different thing because it does not show when that gun is being fired because you just told me. You can't tell. There's no fire coming from the muzzle. There actually is fire. You can see the fire coming from the muzzle. And you can see each of the three distinct ones as to when they occur. I believe that's the case, Your Honor. And that was a measurement that Judge Eagles used, you think? I think she used the fact that this case involved a stolen car that was fleeing, lurching at an officer who had not a moment to pause and consider whether. Some of the facts need to be developed. I mean, I would accept the officer is in the position he's supposed to be in. But surely an officer who's on the side of a car, sees a car getting ready to turn, come this way, you don't get to put yourself there and fire shots at it, do you? We won't go there. We won't get in that. That may come out if this goes further as to whether that's material or something that needs to be dealt with. The only concern with what this video shows, and we'll turn back to, we're here on 12B-6, which is don't, for one moment, think that we're going against you on anything. We're just talking about procedure, where we are right now in this process. And what this court is now being, this kind of argument that's going on now, this discussion as to what that video shows, what did it show this, did it show that. That's not something you want to deal with on 12B-6. I don't think those discrete factual arguments matter when you look at it in the context of Waterman, because even Waterman said . . . Judge Benjamin reminded you that was a summary judgment case. And the . . . You get to do a lot more in summary judgment, a lot more is there, than you do on 12B-6. Understand. If Waterman had been 12B-6, I'd probably be right with you. Wouldn't understand it, but I'd be with you. The last thing I'll say, Your Honor, is that . . . I do have a question about the video. Why would you all submit a narrated video instead of the original body cam? That was an inadvertent oversight when Judge Eagles alerted the parties that since both had relied on the singular YouTube video, she wanted something direct from the source that showed that what the video on YouTube showed was the authentic body-worn camera footage. We got that directly from the source. We submitted it to the court. I will acknowledge that I didn't open the file that was on the flash drive. I made copies of the file. We sent that flash drive to all counsel of record, including an individual who's not counsel of record anymore, and everyone was of the opinion that it was the same YouTube video. And it did, in fact, show the footage and authenticate the footage that was on the YouTube video. I will say I didn't open the file to check because I believed I wanted to maintain the chain of custody without doing anything to impact metadata or anything given what I understood Judge Eagles' request to have the video. But it was edited and it's narrated. There's someone from the communications department going through step-by-step the video stops. I just don't know if that's the best evidence. You would think that the actual body cam video without the narration from someone who may not even be an attorney is a video that should be considered. I see I'm out of time, Your Honor. Would you like me to answer that question? I will say that the YouTube video that all parties relied on in the briefing had no commentary. That's what we submitted. Judge Eagles, in her order, said she ignored everything other than that video. Well, that's troubling, at least in terms of the procedure. YouTube videos, critical incident reports that have been edited for the public, and you know you're not going to put anything out there too much for the public. In this day and age in which we are moving into where videos can be created, I mean with almost exactness, that's problematic. But again, I just remind, we only talk to you on 1236. So wherever this goes from here, keep that in mind. We're not trying to decide your case, try your case, or do anything else. We're dealing with the evidence here. Understood, Your Honor. Thank you. Thank you, Mr. Cain. Mr. Daniels, you have a few minutes if you choose to use it. Yes, Your Honor. One thing I want to point out, counsel, mentioned this court concerning the video that was reviewed by the courts. We did not receive a copy of the video. We subsequently received a copy of what was submitted to the court once we learned that the courts did not, in fact, look at the video that should have been submitted. One of the things also, the body camera, we had an opportunity to review the body camera at the State Bureau of Investigation, and even the body camera on YouTube was, in fact, edited, because at the time it was not part of the record, but I think the court should know that the minor asked a question. I'm sorry? Who put it on YouTube? The city. It's on the city's YouTube page. Did the city have to put it up there? Could somebody else have put one up there? Your Honor, I don't know if the city had to put it up there, but the city, in fact, made the decision to put it up. But the video was not released under North Carolina law. It was not considered a public document. But it, in fact, was released when a decision was made to release by the city. But in the video, in the unedited video, the minor actually tells, and it's on the video that was submitted, but it's blotted out. Had you put that video on that YouTube? I'm sorry, Your Honor? Would we be having a different conversation if your client had put that video on that YouTube? Well, I don't think we'd have a different conversation standard as to whether it was a matter of looking at the pleadings itself, and we relied particularly on the pleadings as such. I don't think it really had mattered. But nevertheless, when you're talking about the video, the video itself, the edited version that was submitted to the courts, and the version that was video one of 104, the minor in the case actually asked, why did you shoot us? Why did you shoot at the car? Then the officer slid and gave his reasoning. That evidence was not before the courts at all, so the courts should consider. And also, Judge, one thing that I definitely want to point to, as I stated before, and Judge Benjamin also, this is a 12 v. 6 stage, not a summer judgment stage, but if we're talking about Waterman, this case is not Waterman, and those factors in Waterman, and you said Waterman two times, the first shooting versus after he passed. This case is not Waterman. There was no high-speed chase, as I stated before. There's no plethora of officers coming towards him with a gun. There was no evidence that he tried to run an officer off the road. That was the main factor that's considered. In the Waterman case, this court did not say that it could not, that an officer shooting a passing vehicle is not unconstitutional. They said based on those facts, it was reasonable for those officers. When you look at this court's decision in Strickland, Strickland specifically talked about Strickland is not Waterman, because those factors, those pre-factors at the first shooting in Waterman, did not apply to Strickland. In fact, this court determined in Strickland that in affirming the district court's decision, if the car had passed or the car had passed scene, it's a violation of the Fourth Amendment rights, which was clearly established in Waterman. So regardless of the police position, that this case is not Waterman on the grounds of passing versus past, it doesn't fit, because Strickland further clarified the Waterman's court in dealing with past or past scene vehicles. The final thing, Your Honor, as it relates to Judge Eagles, Judge Eagles looking at this video, the critical incident video,  getting privy to a dash camera, the issues that the video that the parties were discussing was one body camera, not a dash camera at all. And just before that was shown, and this court's got a chance to review the video, the narration talks about at the time that Santor was coming towards the officer. So preset the position that he's coming towards the officer before the video is shown. That's why we say it was heavily slanted. And to the police position, and we put it on complaint that it was mere inches. We clearly in our complaint that he, the officer Slatton was not in the horns way at the time he started firing. And clearly in our amendment complaint that we allege, and based on Equal Borrowed Formal Standard, the well-pleaded complaint, it is at minimum plausible that officer Slatton shot his vehicle when his vehicle was not his trajectory path. For those reasons, Your Honor, we ask this court to reverse the district court in this matter. Thank you. Thank you, Mr. Daniels. Thank you, Mr. Cain. For your honest, the court is going to come down to greet you and adjourn the court for today. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: James Andrew Wynn, DeAndrea Gist Benjamin, Barbara Milano Keenan